# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
April 6, 2010 Session Heard at Jackson

## MELISSA MICHELLE COX v. M. A. PRIMARY AND URGENT CARE CLINIC et al.

**Appeal by Permission from the Court of Appeals, Middle Section**

**Circuit Court for Rutherford County**
**No. 51941      Royce Taylor, Judge**

_____

**No. M2007-01840-SC-R11-CV - Filed June 21, 2010**

_____

We granted permission to appeal in this case to address the standard of care that applies to a physician assistant in a medical malpractice case. The plaintiff sued for injuries she allegedly suffered as a result of physician assistant Michael Maddox's failure to diagnose her condition accurately. The plaintiff did not sue Maddox, but sued the clinic which he owned and in which he practiced and Dr. Austin Adams, Maddox's supervising physician. The defendants filed a joint motion for summary judgment, supported by their testimony that (1) Maddox did not violate the standard of care applicable to physician assistants and (2) Dr. Adams did not violate the standard of care applicable to physicians. The plaintiff responded with her cardiologist's testimony that Maddox violated the standard of care applicable to primary care physicians. The cardiologist testified that he was not familiar with physician assistants or their supervision. The trial court granted the defendants' motion for summary judgment on the basis that the plaintiff had failed to establish that Maddox violated the professional standard of care applicable to him. The Court of Appeals reversed the trial court, holding that the standard of care applicable to physician assistants is the same as that applicable to physicians. We reverse the Court of Appeals and hold that the standard of care applicable to physician assistants is distinct from that applicable to physicians. The trial court's summary judgment in favor of the defendants is reinstated, and the case is dismissed.

**Tenn. R. App. P. 11; Judgment of the**
**Court of Appeals Reversed; Case Dismissed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

C. J. Gideon, Jr., and Heather Piper-Coke (on appeal), Nashville, Tennessee, and John R. Rucker, Jr. (at trial court), Murfreesboro, Tennessee, for the appellants, M. A. Primary and Urgent Care Clinic and Austin Adams, M.D..

Wm. Kennerly Burger and Claire S. Burger, Murfreesboro, Tennessee, for the appellee, Melissa Michelle Cox.

## OPINION

### Factual and Procedural Background

Beginning in September 2003, plaintiff Melissa Michelle Cox ("Plaintiff") visited defendant M. A. Primary and Urgent Care Clinic ("the Clinic") several times, seeking care for various ailments. During the spring of 2004, she visited the Clinic four times with complaints of "progressive respiratory problems, accompanied by extreme fatigue." During these visits, she was examined and treated by Michael Maddox, a physician assistant. Plaintiff alleges that she also spoke once by telephone with Dr. Adams, the Clinic's medical director and Maddox's supervising physician, about "her increasing alarm regarding her chest pressure, and inability to breathe." According to Plaintiff, her condition continued to worsen dramatically in spite of the treatment she was receiving. On June 8, Maddox referred Plaintiff to Dr. Ray Johnson, a pulmonologist, for consultation. An appointment with Dr. Johnson was scheduled for June 30.

Plaintiff then left for Florida. On June 19, 2004, she sought treatment at the Fort Walton Medical Center Emergency Room, where she was diagnosed with reflux and bronchitis. After her return, Plaintiff sought treatment at StoneCrest Medical Center in Smyrna, Tennessee, on June 23, 2004. She was evaluated by an emergency room physician and discharged home with no treatment given or prescribed.

On June 27, 2004, Plaintiff again sought medical attention at StoneCrest Medical Center. During this second visit to StoneCrest, she was diagnosed with what she describes in her complaint as "a severe form of congestive heart failure." The ultimate diagnosis was cardiomyopathy. A mitral valve repair and then mitral valve replacement surgery were ultimately performed.

On June 3, 2005, Plaintiff filed a medical malpractice action[1] against the Clinic and Dr. Adams. Plaintiff alleges in her complaint that she "maintained a physician/patient relationship with [the Clinic] through physician's assistant Michael Maddox, and Medical Director, Dr. Austin Adams." Plaintiff alleges that the Clinic and Dr. Adams "owed a duty of due care to evaluate, and treat" her medical symptoms "in a manner consistent with the prevailing standard of care in the medical community," that they breached that duty of care, and that she suffered injuries "as a result of the Defendant's failure to diagnose a readily diagnosable serious condition: cardiomyopathy."

---

[1] See Tenn. Code Ann. §§ 29-26-115 to -120 (2000 & Supp. 2009).

2

The Clinic and Dr. Adams (collectively "Defendants") filed a joint answer to the Complaint. They admitted that Plaintiff "established a patient/medical provider relationship with the Clinic" and admitted that Maddox had treated Plaintiff at the Clinic on April 5, April 26, May 17, and June 8, 2004. Defendants denied committing malpractice. Dr. Adams denied that "he provided any medical care to [Plaintiff] and denie[d] that he does business as M. A. Primary and Urgent Care Clinic." Adams further denied that he "ever had a physician/patient relationship with [Plaintiff]."[2] Defendants affirmatively alleged that "the medical care provided to [Plaintiff] met with the recognized standard of acceptable professional practice of the medical providers rendering treatment to [her]."

Defendants subsequently filed a joint motion for summary judgment in which they asserted that "the medical care provided by Michael Maddox, P.A. and Austin Adams, M.D. met with the recognized standard of acceptable professional practice of a physician assistant and a physician practicing in Rutherford County, Tennessee, or a similar community as it existed in 2003 and 2004." In support of their motion, Defendants filed affidavits by Maddox and Dr. Adams. Maddox's affidavit provides, in pertinent part, that he was licensed and actively practicing as a physician assistant in Rutherford County in 2003 and 2004. During those years, he also owned and operated the Clinic. Dr. Adams was his supervising physician.

With respect to treating Plaintiff, Maddox's affidavit provides as follows:

4. [Plaintiff] first presented to the clinic on September 25, 2003 with the chief complaint of body aches, headache and facial pressure. I saw [Plaintiff] in my clinic on three occasions in 2003. On April 5, 2004, [Plaintiff] presented to my clinic complaining of a cough and sore throat for several days. The assessment of her condition on that date was bronchitis, allergic rhinitis, sinusitis and reflux.

5. On April 26, 2004, [Plaintiff] presented to the clinic to discuss her cough which she had had for about four weeks which was worse when she lies down to go to sleep. She reported shortness of breath. A chest x-ray and CT scan of her sinuses were ordered. [T]he chest x-ray showed chronic lung and boney changes and indicated that she may have an element of COPD, [o]therwise, negative for acute changes. The CT scan of her sinus indicated no evidence of paranasal sinusitis. [Plaintiff] next presented to the clinic on May 17, 2004 reporting episodes of cough and shortness of breath. She was

_____

[2] Plaintiff acknowledges in her brief to this Court that, "[o]ver the period of time during which [her] symptoms progressed, she never saw Dr. Adams."

3

examined and pulmonary function studies were ordered which were normal based on smoking history.

6. [Plaintiff] was seen twice in my clinic in June, on June 3, 2004 and June 8, 2004. On June 8, 2004, she was referred to Dr. Ray Johnson, a pulmonologist, for a consult. An appointment was scheduled for her on June 30, 2004. Between June 8, 2004 and June 29, 2004, [Plaintiff] was seen by Dr. Jeffrey Paffrath, an ENT who concurred with my diagnosis.

7. On June 19, 2004, [Plaintiff] was evaluated by an emergency physician at Fort Walton Beach Medical Center who diagnosed her with reflux and bronchitis. On June 23, 2004, [Plaintiff] presented to StoneCrest Medical Center where she was seen and evaluated by the emergency physician and discharged home with no treatment.

8. On June 27, 2004, [Plaintiff] presented back to StoneCrest Medical Center and was seen by an emergency physician and other physicians who diagnosed [Plaintiff] as having congestive heart failure.

9. The medical care which I provided to [Plaintiff] in 200[3] and 200[4][3] complied with the recognized standard of acceptable professional practice of a physician assistant practicing in Rutherford County, Tennessee, or a similar community. Further, [Plaintiff] did not sustain any injury which was the result of any act or omission on my part which failed to meet with the recognized standard of acceptable professional practice of a physician assistant practicing at the time I provided medical care to [Plaintiff].

Dr. Adams's affidavit explains that he has been licensed to practice medicine in Tennessee since 1994 and that his area of specialty is "occupational and urgent care medicine and family practice." He was Maddox's supervising physician in 2003 and 2004. According to Dr. Adams, he is familiar with the "recognized standard of acceptable professional practice" in Rutherford County of both family physicians and physician assistants. Dr. Adams's affidavit provides further as follows:

---

[3] Maddox's affidavit actually refers in paragraph 9 to the years "2002 and 2003." We construe this reference to be a typographical error as there is no allegation anywhere in the record that Maddox saw Plaintiff in 2002. Moreover, Plaintiff has raised no issue regarding this anomaly and has admitted Defendants' statements of fact that she was seen by Maddox in 2003 and 2004. We note, however, that affidavits supporting or opposing motions for summary judgment should be accurate in every respect.

4

5. In 2004, I was a supervising physician of Michael Maddox, P.A. I reviewed the office notes and medical records Mr. Maddox prepared reflecting the evaluation and treatment he provided to [Plaintiff].

6. The medical evaluation and treatment provided by Michael Maddox, P.A. to [Plaintiff] during [2004][4] complied with the recognized standard of acceptable professional practice of a physician assistant practicing in Rutherford County, Tennessee, or a similar community. Additionally, the supervision which I provided to Michael Maddox, P.A., in 2004 complied with the recognized standard of acceptable professional practice of a physician serving in the position of supervising physician of a physician assistant.

7. During 2004, I did not personally see [Plaintiff] as a patient. The only involvement I had with [Plaintiff] was as supervising physician of Michael Maddox, P.A. There may have been one occasion where I spoke with [Plaintiff] over the phone regarding the medical care provided by Michael Maddox, P.A. The professional services which I provided to [Plaintiff] during 2004 complied with the recognized standard of acceptable professional practice of a physician practicing family medicine and a physician serving as supervising physician of a physician assistant.

8. In my opinion, Michael Maddox, P.A. appropriately evaluated, treated and referred [Plaintiff] for other treatment and evaluation. [Plaintiff] was seen by other medical providers and physicians during the period of time that she was being seen by Michael Maddox.

9. [Plaintiff] did not sustain any injury which was the result of any act or omission on my part or on the part of Michael Maddox, P.A., which failed to comply with the recognized standard of acceptable professional practice of a family physician and a physician assistant at the time [Plaintiff] received medical care from Mr. Maddox.

Defendants also filed with the trial court a statement of undisputed facts which alleged, among other things, that "[t]he medical care provided to [Plaintiff] in 2003 and 2004 by Michael Maddox, P.A., complied with the recognized standard of acceptable professional

---

[4] Dr. Adams's affidavit actually refers to the year "1994." As with Maddox's affidavit, this appears to be a typographical error because, according to their curriculum vitae, Maddox did not begin his practice as a physician assistant until 1996, and Dr. Adams was completing his residency at Meharry/Hubbard Hospital in Nashville in 1994. Plaintiff has not raised this as an issue and has admitted that her treatment by Maddox occurred in 2004.

practice of a physician assistant practicing in Rutherford County, Tennessee, or a similar community," and that

> [t]he professional services and medical care provided to [Plaintiff] in 2003 and
> 2004 by Austin Adams, M.D., complied with the recognized standard of
> acceptable professional practice of a physician practicing family medicine and
> a physician serving as supervising physician of a physician assistant as it
> existed in Rutherford County, Tennessee, or a similar community.

Plaintiff denied both of these statements in her response to Defendants' statement of undisputed facts. In support of her denial, and in opposition to Defendants' motion for summary judgment, Plaintiff submitted the deposition testimony of Dr. Nelson Mangione, the cardiologist who diagnosed and treated Plaintiff's congestive heart failure. Dr. Mangione's deposition was the only expert proof Plaintiff submitted in opposition to Defendants' motion for summary judgment.[5] Dr. Mangione testified that Michael Maddox's services to Plaintiff fell "outside" the standard of care applicable to a primary care physician. Dr. Mangione also opined that, based on the medical records he reviewed, Dr. Adams met the standard of care applicable to a primary care physician.

Most significantly to the issue in this case, Dr. Mangione testified that he had never worked with physician assistants; did not know "the responsibility of the supervising physician with respect to his duties toward a physician assistant"; and was "not in a position" to testify about the "standard of acceptable professional practice of a physician assistant."

The trial court granted Defendants' motion for summary judgment on the basis that Plaintiff failed to establish (1) the applicable standard of care or (2) that Defendants had

---

[5] In her response to Defendants' motion for summary judgment, Plaintiff also quoted from her deposition with citations to the page numbers on which the quotes could (purportedly) be found. However, it appears that the deposition was not made an exhibit to the response, and it does not otherwise appear in the record. Moreover, the trial judge made no reference to Plaintiff's deposition in his ruling on Defendants' motion for summary judgment. Plaintiff has again referred to her deposition testimony in her brief to this Court. In their reply brief, Defendants have objected to some of this testimony on the basis that it is inadmissible hearsay.

Because Tennessee Rule of Civil Procedure 56.03 requires a party opposing a motion for summary judgment to support each disputed fact "by specific citation to *the record*," (emphasis added), the citation should be to an item that has been filed with the trial court as, for instance, an exhibit. Parties should not simply refer to a page number in an alleged document that the trial court is given no opportunity to review. As this Court has recognized, "[f]or facts to be considered at the summary judgment stage, they must be included in the record." Green v. Green, 293 S.W.3d 493, 513 (Tenn. 2009). Further, such facts "must be admissible in evidence." Id. Accordingly, we do not consider asserted facts set forth solely in the "excerpts" from Plaintiff's deposition. Finally, our consideration of those facts would not change our analysis or the outcome of this case.

6

failed to meet it. The trial court also ruled that Plaintiff failed to establish causation. On appeal, the Court of Appeals reversed the trial court on the basis of its legal conclusion that "the standard of care applicable to a physician assistant is that of the supervising physician in the community in which the supervising physician practices."[6] Cox v. M.A. Primary and Urgent Care Clinic, No. M2007-01840-COA-R3-CV, 2009 WL 230242, at *4 (Tenn. Ct. App. Jan. 30, 2009). Because Dr. Mangione did testify about the standard of care applicable to a primary care physician – the status occupied by Maddox's supervising physician, Dr. Adams – and because he testified that Maddox failed to meet that standard of care, the Court of Appeals held that Dr. Mangione's testimony was "sufficient to establish a genuine issue of material fact relative to the requirement of Tenn. Code Ann. § 29-26-115(a)(2) and . . . consequently, [Plaintiff] met her burden to produce evidence of specific facts establishing that genuine issues of material fact exist." Id. at * 5. We granted Defendants' application for permission to appeal in order to address the standard of care which applies to a physician assistant in a medical malpractice case. This is an issue of first impression before this Court.

## STANDARD OF REVIEW

This matter comes to us upon the trial court's grant of Defendants' motion for summary judgment. When reviewing the disposition of a motion for summary judgment, we examine the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party and disregard all countervailing evidence. Kelley v. Middle Tenn. Emergency Physicians, 133 S.W.3d 587, 591 (Tenn. 2004). Our review of the trial court's ruling is de novo with no presumption of correctness. Id.

## ANALYSIS

The central issue in this case is what standard of professional care applies to physician assistants practicing their profession. Determination of that issue requires us to understand the rise of that profession.

### Physician Assistants

According to one commentator, physician assistants "were introduced in the United States during the mid-1960's to fill the gap in primary health care services created by a physician shortage." James H. Cook, Note, The Legal Status of Physician Extenders in Iowa: Review, Speculations, and Recommendations, 72 Iowa L. Rev. 215, 215 (1986) (footnote omitted). Physician assistants "generally work under the supervision of or in close

---

[6] The Court of Appeals also reversed the trial court's ruling that Plaintiff failed to establish a genuine issue of fact regarding causation. Our disposition of the standard of care issue renders it unnecessary for us to address that issue.

7

relationship with physicians as part of a multitiered heath care team" and "perform numerous routine clinical procedures, thereby freeing physicians to concentrate on complex medical problems." Id. According to the United States Bureau of Labor Statistics, physician assistants "take medical histories, examine and treat patients, order and interpret laboratory tests and x rays, and make diagnoses. They also treat minor injuries by suturing, splinting, and casting. [Physician assistants] record progress notes, instruct and counsel patients, and order or carry out therapy. [Physician assistants] also may prescribe certain medications." Bureau of Labor Statistics, U.S. Dep't of Labor, Occupational Outlook Handbook, 2010-11 Ed., Physician Assistants, on the Internet at http://www.bls.gov/oco/ocos081.htm (last visited June 21, 2010). In 2008, physician assistants held almost 75,000 jobs. Id.

Another commentator explains, "[t]he rationale behind increasing utilization of physician [assistants] is that [they] 'lower [the] cost of providing health care, reduce physician stress, [provide] higher levels of patient satisfaction, and improve quality of care resulting from the team approach.'" Thomas R. McLean, Crossing the Quality Chasm: Autonomous Physician Extenders Will Necessitate a Shift to Enterprise Liability Coverage for Health Care Delivery, 12 Health Matrix 239, 257 (2002) (quoting Patrick Knott & Kathleen Ruroede, One Solution for Managing Risks During Cutbacks in Residency Training Programs, 11 Risk: Health, Safety & Env't 35, 39 (2000)). Dr. McLean observes that physician assistants enable doctors to delegate certain health tasks and that "society views physician [assistants] as subordinate to physicians." Id.

Since 1985, Tennessee has recognized physician assistants as medical providers pursuant to the provisions of the Physician Assistants Act, Tenn. Code Ann. §§ 63-19-101 to -115 (2004 & Supp. 2009) ("the Act").[7] In passing the Act, our legislature indicated clearly its recognition that physician assistants and medical doctors are members of distinct professions. A physician assistant is defined under the Act as "an individual who renders services, whether diagnostic or therapeutic, that are acts constituting the practice of medicine or osteopathic medicine and, but for the provisions of § 63-6-204[8] and § 63-9-113,[9] could only be performed by a licensed physician." Tenn. Code Ann. § 63-19-102(5) (footnotes added).

---

[7] See also Tenn. Code Ann. §§ 63-19-201 to -210 (2004) (containing specific provisions regarding orthopedic physician assistants).

[8] Tennessee Code Annotated section 63-6-204(b) provides that "[n]othing in this chapter shall be so construed as to prohibit service rendered by a physician assistant, registered nurse or a licensed practical nurse if such service is rendered under the supervision, control and responsibility of a licensed physician[.]"

[9] Tennessee Code Annotated section 63-9-113 (2004) provides that "[n]othing in this chapter shall be so construed as to prohibit osteopathic medical service rendered by a physician assistant, registered nurse, or licensed practical nurse if such osteopathic medical service is rendered under the supervision, control, and responsibility of a licensed osteopathic physician."

The "practice of medicine" is defined as the treatment, diagnosis, operation upon, or prescription for, "any physical ailment or any physical injury to or deformity of another." Id. § 63-6-204(a)(1) (Supp. 2009).

Physician assistants must be licensed, id. § 63-19-105(a), and licensure is generally available only upon graduation from an accredited physician assistant training program[10] and successful completion of "the examination of the National Commission on the Certification of Physician Assistants." Id. at (a)(1), (2). Licensed Tennessee physician assistants are statutorily authorized to perform only selected medical services as follows:

> (a) A physician assistant is authorized to perform selected medical services only under the supervision of a licensed physician.

> (1) Supervision requires active and continuous overview of the physician assistant's activities to ensure that the physician's directions and advice are in fact implemented, but does not require the continuous and constant physical presence of the supervising physician. The board and the committee shall adopt, by September 19, 1999, regulations governing the supervising physician's personal review of historical, physical and therapeutic data contained in the charts of patients examined by the physician assistant.

---

[10] The American Academy of Physician Assistants describes physician assistant ("PA") training as follows:

> PA education is modeled on physician education. Matriculants to PA programs must have completed at least two years of undergraduate courses in basic science and behavioral science as prerequisites to PA training. This is analogous to premedical studies required of medical students. PA programs are located at medical schools and teaching hospitals, and PA students commonly share classes, facilities and clinical rotations with medical students.
>
> PA educational training is intensive. The average length of PA education programs is about 27 months. Students begin their course of study with a year of basic medical science classes (anatomy, pathophysiology, pharmacology, physical diagnosis, etc.). After the science classroom work, PA students enter the clinical phase of training. This includes classroom instruction and clinical rotations in medical and surgical specialties (family medicine, internal medicine, obstetrics and gynecology, pediatrics, general surgery, emergency medicine and psychiatry). Due to these demanding rotation requirements, PA students will have completed 2,000 hours of supervised clinical practice by the time they graduate.

AAPA Issue Brief, PA Scope of Practice, Jan. 2010, http://www.aapa.org/images/stories/IssueBriefs/Professional%20Issues/PA%20Scope%20of%20Practice%20-%202010.pdf (footnote omitted) (last visited June 21, 2010).

(2) The range of services that may be provided by a physician assistant shall be set forth in a written protocol, jointly developed by the supervising physician and the physician assistant. The protocol shall also contain a discussion of the problems and conditions likely to be encountered by the physician assistant and the appropriate treatment for these problems and conditions. . . .

(3) A physician assistant may perform only those tasks that are within the physician assistant's range of skills and competence, that are within the usual scope of practice of the supervising physician, and that are consistent with the protection of the health and well-being of the patients.

(4) The physician assistant may render emergency medical service in accordance with guidelines previously established by the supervising physician pending the arrival of a responsible physician in cases where immediate diagnosis and treatment are necessary to avoid disability or death.

(b) A physician assistant shall function only under the control and responsibility of a licensed physician. The supervising physician has complete and absolute authority over any action of the physician assistant. There shall, at all times, be a physician who is answerable for the actions of the physician assistant and who has the duty of assuring that there is proper supervision and control of the physician assistant and that the assistant's activities are otherwise appropriate.

Id. § 63-19-106(a), (b).

The Act also provides for the creation of a "committee on physician assistants" ("the Committee"). Id. § 63-19-103(a). Each member of the Committee is required to be a licensed physician assistant. Id. The Act charges the Committee with the duty to promulgate rules "reasonably necessary for the performance of the duties of the physician assistants, including, but not limited to, rules that specify the acts and offenses that subject the license holder to disciplinary action by the committee . . . ." Id. § 63-19-104(a)(1).

In compliance with its statutory duty, the Committee has promulgated the General Rules and Regulations Governing the Practice of a Physician Assistant, Tenn. Comp. R. & Regs. 0880-03-.01 to -.24 (2009) ("the Rules"), including the following provision:

A physician assistant who holds state license in accordance with T.C.A. § 63-19-105 may provide selected medical/surgical services as outlined in a written protocol according to T.C.A. § 63-19-106, and when such services are within

10

his skills. The services delegated to the physician assistant must form a usual component of the supervising physician's scope of practice. Services rendered by the physician assistant must be provided under the supervision, direction, and ultimate responsibility of a licensed physician accountable to the Board of Medical Examiners or the Board of Osteopathic Examination under the provision of T.C.A. § 63-19-109.

Tenn. Comp. R. & Regs. 0880-03-.02. Further,

> (1) The range of services which may be provided by a physician assistant shall be set forth in a written protocol, jointly developed and signed by the physician assistant and the supervising physician and maintained at the physician assistant's practice location.

> (2) A physician assistant is authorized to perform the services outlined in his or her protocol under the supervision of a supervising physician who complies with all the requirements of [Tenn. Comp. R. & Regs.] 0880-02-.18.[11]

> (3) Each physician assistant shall have a designated primary supervising physician and shall notify the Committee of the name, address, and license number of his/her primary supervising physician and shall notify the Committee of any change in such primary supervising physician within fifteen (15) days of the change.

Id. 0880-03-.10 (footnote added). Significantly, the Rules authorize the Board of Medical Examiners and the Committee to discipline a physician assistant for, among other things, "[g]ross malpractice, or a pattern of continued or repeated malpractice, ignorance, negligence or incompetence *in the course of practice as a physician assistant*" and for "[v]iolation of the scope of practice statutes T.C.A. §§ 63-19-106 through 63-19-108 and Rules 0880-03-.02 and 0880-03-.10." Id. 0880-03-.15(1)(d), (1)(s) (emphasis added). Although neither the Act nor the Rules contains an explicit "standard of care" applicable to physician assistants,[12] it is clear that the Committee determines whether to discipline physician assistants for malpractice by reference to the practice of physician assistants and not by reference to the practice of physicians.

_____

[11] This regulation sets forth the requirements that apply to a physician who supervises one or more physician assistants.

[12] There is, however, a statutory provision titled "[s]tandard of care" applicable to orthopedic physician assistants. See Tenn. Code Ann. § 63-19-204.

11

In addition to the Rules, the Board of Medical Examiners has promulgated the General Rules and Regulations Governing the Practice of Medicine, which include a specific section dealing with the supervision of physician assistants. See Tenn. Comp. R. & Regs. 0880-02-.18 (2009). That section provides that written protocols "are required" and that they "shall outline and cover the applicable standard of care." Id. at (5)(b). The section also provides that "[t]he supervising physician shall be responsible for ensuring compliance with the applicable standard of care under (5)." Id. at (6).

## Relationship Between Physician Assistant, Supervising Physician, and Employer

The gravamen of Plaintiff's lawsuit is that Maddox was negligent in his evaluation and treatment of her condition, resulting in injury to her. However, Plaintiff did not sue Maddox individually. Instead, she sued the Clinic and Dr. Adams. To prevail, Plaintiff must establish a legal basis for holding Defendants liable for the alleged malpractice committed by Maddox. Thus, before we address the proper standard of care applicable to Maddox, we must determine whether the negligence of Maddox, if proven, can provide a basis for judgment against either of the Defendants.

In Tennessee, a principal may be held vicariously liable for the negligence of his or her agent, where the agent is acting within the actual or apparent scope of the agency. Boren ex rel. Boren v. Weeks, 251 S.W.3d 426, 432 (Tenn. 2008). Whether an agency relationship exists between two persons is a question of fact "and is determined by examining the agreement between the parties or the parties' actions." Id. This Court has not previously had an occasion to determine whether a physician assistant stands in an agency relationship with his or her supervising physician and/or with his employer.

### *Relationship to Supervising Physician*

Other states have addressed the relationship between physician assistant and doctor in at least three ways. A significant number of states have adopted statutes specifying that a physician assistant is an agent of his or her supervising physician.[13] A few states have

---

[13] See, e.g., Ala. Code § 34-24-292(b) (Westlaw through Act 2010-499 of 2010 Reg. Sess.) ("In the performance of any medical service contemplated by this article, an assistant to a physician shall be conclusively presumed to be the agent, servant or employee solely of the licensed physician or physicians under whose supervision he or she performs the service, and no other person, firm, corporation or other organization shall be held liable or responsible for any act or omission of the assistant arising out of the performance of the medical service."); Ark. Code Ann. § 17-105-107(b) (West, Westlaw through 2010 Fiscal Sess.) ("Physician assistants shall be considered the agents of their supervising physicians in the performance of all practice-related activities, including, but not limited to, the ordering of diagnostic, therapeutic, and other medical services."); Ky. Rev. Stat. Ann. § 311.858(2) (West, Westlaw through 2009 legislation) ("A

legislation specifically providing that a supervising physician is liable for the acts or omissions of his or her physician assistant.[14] Numerous other states have legislation similar to Tennessee's, which refers more generally to the supervising physician's "responsibility" for his or her physician assistants.[15]

---

physician assistant shall be considered an agent of the supervising physician in performing medical services and procedures . . . ."); La. Rev. Stat. Ann. § 37:1360.31(A)(1) (West, Westlaw through 2009 Reg. Sess.) ("A physician assistant is considered to be and is deemed the agent of his supervising physician in the performance of all practice-related activities . . . ."); Mich. Comp. Laws Ann. § 333.17078 (1) (West, Westlaw through P.A. 2010, No. 84, of 2010 Reg. Sess.) ("A physician's assistant is the agent of the supervising physician or supervising podiatrist."); Neb. Rev. Stat. Ann. § 38-2047(2) (West, Westlaw through 1st Sp. Sess. 2009) ("A physician assistant shall be considered an agent of his or her supervising physician in the performance of practice-related activities delegated by the supervising physician . . . ."); Okla. Stat. Ann. tit. 59, § 519.6B(e) (West, Westlaw through Ch. 170 of 2nd Reg. Sess. 2010) ("the physician assistant is an agent of the supervising physician"); R.I. Gen. Laws § 5-54-8(a) (West, Westlaw through ch. 392 of Jan. 2009 Sess.) ("Physician assistants shall practice with physician supervision and shall be considered the agents of their supervising physicians in the performance of all practice-related activities."); Utah Code Ann. § 58-70a-102(4)(b) (West, Westlaw through 2009 Gen. & 1st Sp. Sess.) ("the physician assistant acts as the agent of the supervising physician . . . when acting in accordance with a delegation of services agreement.").

[14] See, e.g., Fla. Stat. Ann. § 458.347(15) (West, Westlaw through May 17, 2010) ("Each supervising physician using a physician assistant is liable for any acts or omissions of the physician assistant acting under the physician's supervision and control."); La. Rev. Stat. Ann. § 37:1360.22(8) (West, Westlaw through 2009 Reg. Sess.) (defining a physician's supervision of a physician assistant as meaning "responsible direction and control, with the supervising physician assuming legal liability for the services rendered by the physician assistant in the course and scope of the physician assistant's employment."); Neb. Rev. Stat. Ann. § 38-2053 (West, Westlaw through 1st Sp. Sess. 2009) ("Any physician or physician groups utilizing physician assistants shall be liable for any negligent acts or omissions of physician assistants while acting under their supervision and control."). Moreover, other courts and commentators have recognized that a physician supervising a physician assistant may face vicarious liability for the negligence of the physician assistant. See, e.g., Petzel v. Valley Orthopedics Ltd., 770 N.W.2d 787, 792-94 (Wis. Ct. App. 2009); Symons v. Prodinger, No. 269663, 2008 WL 4890177, at *12 (Mich. Ct. App. Nov. 13, 2008) (Markey, J., concurring in part, dissenting in part), rev'd on other grounds, 768 N.W.2d 317 (Mich. 2009); Cook, supra, at 230-235; McLean, supra, at 266-270; Chris L. Gore, Comment, A Physician's Liability for Mistakes of a Physician Assistant, 21 J. Legal Med. 125, 135-140 (March 2000).

[15] See, e.g., Cal. Bus. & Prof. Code § 3501(f) (West, Westlaw through 2010 8th Ex. Sess. (except 6th) & ch. 20 of 2010 Reg. Sess.) (defining "supervision" as meaning "that a licensed physician and surgeon oversees the activities of, and accepts responsibility for, the medical services rendered by a physician assistant."); Conn. Gen. Stat. Ann. § 20-12c(a) (West, Westlaw through 2010 Supp. to Conn. Gen. Stat.) ("Each physician assistant practicing in this state . . . shall have a clearly identified supervising physician who maintains the final responsibility for the care of patients and the performance of the physician assistant."); Del. Code Ann. tit. 24, § 1771(a) (West, Westlaw through 77 Laws 2010, chs. 1-255) ("A physician who delegates medical acts to a physician assistant is responsible for the physician assistant's medical acts and must provide adequate supervision."); Kan. Stat. Ann. § 65-28a02(5) (West, Westlaw through 2009 Reg. Sess.) (defining a physician assistant's "responsible physician" as "a physician who has accepted continuous and ultimate

In this case, it is uncontroverted that Dr. Adams acted as Maddox's supervising physician. While the record before us does not contain any writing purporting to set forth the precise contours of their relationship, our review of the pertinent Tennessee statutory provisions and the Rules set forth above convinces us that, as a general matter, a physician assistant stands in an agency relationship with his or her supervising physician when the physician assistant is providing authorized medical services within the scope of the parties' joint protocol. Specifically, Tennessee Code Annotated section 63-19-106(b) states that "[a] physician assistant shall function only under the *control and responsibility* of a licensed physician" and that "[t]here shall, at all times, be a physician who *is answerable for the actions of the physician assistant*." (Emphases added.) Moreover, the Rules provide that

responsibility for the medical services rendered and actions of the physician assistant while performing under the direction and supervision of the responsible physician."); Mass. Gen. Laws Ann. ch. 112, § 9E (West, Westlaw through ch. 112 of 2010 2nd Annual Sess.) (providing that, where physician assistant is employed by a physician, "[t]he legal responsibility of such assistant shall remain that of the employing physician" and, where physician assistant "is employed by a health care facility, the legal responsibility for his actions and omissions shall be that of the employing facility"); Minn. Stat. Ann. § 147A.01 subd. 24 (West, Westlaw through ch. 214 of 2010 Reg. Sess.) (defining a physician's supervision of a physician assistant as "overseeing the activities of, and accepting responsibility for, the medical services rendered by a physician assistant"); Miss. Code Ann. § 73-26-1(d) (West, Westlaw through 2009 Sess.) (defining a physician's supervision of a physician assistant as "overseeing and accepting responsibility for the medical services rendered by a physician assistant . . . ."); Mo. Ann. Stat. § 334.735-9 (West, Westlaw through Mar. 4, 2010 legislation) ("At all times the physician is responsible for the oversight of the activities of, and accepts responsibility for, health care services rendered by the physician assistant."); Ohio Rev. Code Ann. § 4730.01(A) (West , Westlaw through File 32 of 128th G.A.) ("'Physician assistant' means a skilled person qualified by academic and clinical training to provide services to patients as a physician assistant under the supervision, control, and direction of one or more physicians who are responsible for the physician assistant's performance."); S.C. Code Ann. § 40-47-955(A) (Westlaw through 2009 Reg. Sess.) ("The supervising physician is responsible for all aspects of the physician assistant's practice."); S.D. Codified Laws § 36-4A-1(4) (Westlaw through 2009 Reg. Sess.) (defining a physician's supervision of a physician assistant as "the act of overseeing the activities of, and accepting responsibility for, the medical services rendered by a physician assistant."); Tex. Occ. Code Ann. § 204.204(a) (West, Westlaw through 2009 Sess.) ("The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant."); Va. Code Ann. § 54.1-2952 B (West, Westlaw through 2010 Reg. Sess. cc. 1, 2, 16, 21, 28, 31, 136, 138, & 145) (a physician who employs a physician assistant "shall be fully responsible for the acts of the assistant in the care and treatment of human beings."); W. Va. Code Ann. § 30-3-16(a)(5) (West, Westlaw through H.B. 4040 of 2010 Reg. Sess.) ("'Supervising physician' means a doctor or doctors of medicine or podiatry permanently and fully licensed in this state without restriction or limitation who assume legal and supervisory responsibility for the work or training of any physician assistant under his or her supervision."); Wis. Stat. Ann. § 448.21(2) (West, Westlaw through 2009 Act 220) ("No physician assistant may be self-employed. The employer of a physician assistant shall assume legal responsibility for any medical care provided by the physician assistant during the employment. The employer of a physician assistant, if other than a licensed physician, shall provide for and not interfere with supervision of the physician assistant by a licensed physician."); Wyo. Stat. Ann. § 33-26-501(a)(v)(A) (West, Westlaw through 2009 Gen. Sess.) (defining a physician assistant's supervising physician as one "who utilizes and agrees to be responsible for the medical acts of a board-approved physician assistant").

"[s]ervices rendered by the physician assistant must be provided under the *supervision, direction, and ultimate responsibility* of a licensed physician." Tenn. Comp. R. & Regs. 0880-03-.02(1) (emphasis added).

These Tennessee authorities establish that, where a medical doctor delegates certain responsibilities to her physician assistant, she remains responsible for the assistant carrying out those responsibilities in an appropriate manner. Under these circumstances, the physician assistant occupies the role of agent and the supervising doctor occupies the role of principal. In this case, the uncontroverted proof establishes that Dr. Adams stood in an agency relationship with Maddox insofar as Dr. Adams acted as Maddox's supervising physician and insofar as Maddox acted within the scope of the agency.[16] Accordingly, Dr. Adams could be found vicariously liable for Maddox's negligence, if proven.

*Relationship to Employer*

As to the Clinic, Defendants' brief to this Court describes Maddox as an "employee" of the Clinic. A health care facility which employs a physician assistant may face liability for the physician assistant's negligence under the agency theory of respondeat superior. See Edmonds v. Chamberlain Mem'l Hosp., 629 S.W.2d 28, 30 (Tenn. Ct. App. 1981) ("It is well-settled that hospitals are liable for the negligent acts of their agents and employees even though they are selected with due care.").[17] Thus, the Clinic also is subject to liability if Maddox is found to have been negligent.

---

[16] Because the record does not contain a copy of the statutorily-required written protocol between Maddox and Dr. Adams, or any other pre-litigation writing setting forth the parameters of their working relationship, we offer no opinion about the precise scope of their agency relationship or their respective rights and obligations. We simply note that the applicable statutes and regulations imply some level of agency between a physician assistant and his or her supervising physician by operation of law.

[17] The record does not otherwise establish, however, the legal relationships between the Clinic and Maddox or the Clinic and Dr. Adams. Although the uncontroverted proof establishes that Maddox owned and operated the clinic during 2003 and 2004, we cannot discern from the record whether Maddox operated the Clinic as a sole proprietorship or whether it existed in some partnership or corporate form. Nor can we discern whether Dr. Adams was an employee of, or an independent contractor with, the Clinic. Fortunately, our disposition of this case does not require this information. We note, however, that the legal basis for an entity's existence, and its legal relationships with other persons (natural or artificial), may have significant ramifications to the litigation and should be established in the event of appellate review. The Office of the Attorney General for the State of Tennessee has issued an opinion addressing some of the legal issues surrounding the business relationships between physician assistants, their supervising physicians, and their business organizations. See Tenn. Op. Atty. Gen. No. 07-116, 2007 WL 2819326 (Aug. 8, 2007).

**Physician Assistant Standard of Care**

We turn now to the central issue in this case: the standard of care applicable to physician assistants. Plaintiff argues in her brief to this Court that the Act establishes that a physician assistant is "actually practicing medicine on behalf of the supervising doctor" and "as the doctor's representative." Given that a physician assistant is practicing medicine, Plaintiff asserts, he or she must be held to the same standard of care applied to his or her supervising physician. This is an issue of first impression in Tennessee.

Commentators have advocated for separate standards of care for physician assistants. See, e.g., Cook, supra, at 239 ("The Iowa courts should adopt the standard of care of the reasonably prudent [physician assistant] acting under the same or similar circumstances."); McLean, supra, at 261-62 (analogizing that physician assistants are to physicians as paralegals are to lawyers and asserting that "a different 'measuring stick' needs to be used to evaluate" the services provided by each). And, while the cases have arisen in different contexts, numerous courts have analyzed why different standards of care should apply to physician assistants and medical doctors.

For example, in Bradford v. Alexander, the Texas Court of Appeals held that, in a medical malpractice case, a physician assistant is not competent to testify about the standard of care to which a medical doctor is held. 886 S.W.2d 394, 397 (Tex. Ct. App. 1994). The court reasoned,

> It would indeed lead to incongruity if we permitted a subordinate to testify as an expert concerning the standard of care to which we hold his or her supervisor, who has greater knowledge and training than the subordinate. We do not allow paralegals to testify about the standard of care a licensed attorney owes his client; a physician's assistant should not be treated with greater deference.

Id. See also Paris v. Kreitz, 331 S.E.2d 234, 247 (N.C. Ct. App. 1985) (recognizing that physician assistants are "not subject to the same standard of practice as . . . a medical doctor"); Johnson v. Westfield Mem'l Hosp., Inc., 710 N.Y.S.2d 862, 863 (N.Y. Sup. Ct. 2000) (recognizing that a physician assistant's standard of care is different than an ophthalmologist's, "a specialist, held to a higher standard of care even than an average physician"); Land v. Barnes, No. M2008-00191-COA-R3-CV, 2008 WL 4254155, at *6 (Tenn. Ct. App. Sept. 10, 2008) (recognizing that, "[s]ince a physician's assistant may only render diagnostic or therapeutic services under the 'supervision, control and responsibility of a licensed physician,' there is considerable doubt that a physician's assistant would be competent to testify as to causation" in a medical malpractice case); cf. Philipp v. McCreedy, 298 S.W.3d 682, 687-89 (Tex. Ct. App. 2009) (recognizing that a medical doctor familiar with

the standard of care for physician assistants may qualify to testify about a physician assistant's alleged negligence). A number of our sister states also have statutory provisions that appear to contemplate a different standard of care for health care providers depending on their specific profession.[18]

A persuasive analysis of the reasons for assigning a different standard of care to physician assistants was provided by the Superior Court of Delaware. In Wilson v. James, the plaintiff sued Dr. James, physician assistant Montague, and New Castle Family Care for their alleged negligence in failing to properly diagnose the plaintiff's young son. No. 07C-04-025 PLA, 2010 WL 1107787 (Del. Super. Feb. 19, 2010). Montague filed a motion in limine to keep the plaintiff's expert, a medical doctor, from testifying about the standard of care applicable to a physician assistant because the plaintiff's expert doctor had stated during his

---

[18] See, e.g., Ala. Code. § 6-5-548(a) (Westlaw through Act 2010-499 of 2010 Reg. Sess.) ("In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."); Ariz. Rev. Stat. Ann. § 12-563(1) (West, Westlaw through legislation effective Apr. 27, 2010) (a necessary element of proof in a medical malpractice case is that the "health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs"); Conn. Gen. Stat. Ann. § 52-184c(b) (West, Westlaw through 2010 Supp. to Conn. Gen. Stat.) (standard of care for non-specialists determined by licensure, training, and experience "in the same discipline or school of practice"); Fla. Stat. Ann. § 766.102(6) (West, Westlaw through May 17, 2010 legislation) (an expert witness physician "who, by reason of active clinical practice or instruction of students, has knowledge of the applicable standard of care for nurses, nurse practitioners, certified registered nurse anesthetists, certified registered nurse midwives, physician assistants, or other medical support staff may give expert testimony in a medical negligence action with respect to the standard of care of such medical support staff"); Idaho Code Ann. § 6-1012 (West, Westlaw through Apr. 12, 2010 legislation) (plaintiff in medical malpractice case must establish that health care provider "negligently failed to meet the applicable standard of health care practice of the community . . . as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning"); Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(c)(1) (West, Westlaw through 2010 Reg. Sess. legislation effective through May 20, 2010) ("the health care provider is not liable for the payment of damages unless it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience"); N.C. Gen. Stat. Ann. § 90-21.12 (West, Westlaw through 2009 Reg. Sess.) (plaintiff must demonstrate that health care provider's care "was not in accordance with the standards of practice among members of the same health care profession with similar training and experience"); Wash. Rev. Code Ann. § 7.70.040(1) (West, Westlaw through Apr. 22, 2010 legislation) (proof must demonstrate that health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs"); W. Va. Code Ann. § 55-7B-3(a)(1) (West, Westlaw through H.B. 4040 of 2010 Reg. Sess.) (proof must demonstrate that "health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs").

deposition that "he was unaware of what the 'scope of practice of physician's assistants' was under Delaware law, or of how a physician's assistant's training and duties differed from those of a nurse practitioner." Id. at *2. The plaintiff argued that Montague should be held to a pediatrician's standard of care.

The court characterized the plaintiff's contention as "bewildering," id. at *3, and held that the plaintiff's expert's "admitted lack of familiarity with the practices of physicians' assistants in Delaware render[ed] him unqualified to articulate the standard of care for a physician's assistant, and by implication he cannot express a competent opinion as to whether Montague violated that standard," id. at *2. The court explained that

> it is contrary to Delaware law, which, among other limitations, explicitly prohibits physicians' assistants from performing "any medical act which has not been delegated by a supervising physician," except in emergencies or as specifically authorized by statute. Although common sense might provide a quicker route to the same conclusion, the Medical Practice Act's limitations upon a physician's assistant's scope of practice make clear that the applicable standard of care for a pediatric physician's assistant cannot be identical to the standard of care for a Board-certified pediatrician.

Id. at *3 (footnotes omitted).

A few jurisdictions have nevertheless imposed on physician assistants the same standard of care as that required of medical doctors. For instance, a Michigan statute provides that "[a] physician's assistant shall conform to minimal standards of acceptable and prevailing practice for the supervising physician or supervising podiatrist." Mich. Comp. Laws Ann. § 333.17078(2) (West, Westlaw through P.A. 2010, No. 78 (except 75 & 77), of 2010 Reg. Sess.). Wyoming's Board of Medicine Rules and Regulations provide that "a physician assistant is expected to perform with similar skill and competency and to be evaluated by the same standards as the physician in the performance of assigned duties." Wyo. Bd. of Med. R. & Regs., ch. 5 § 4(d) (2009). See also Cleveland v. United States, 457 F.3d 397, 404-05 (5th Cir. 2006) (opining that, under Louisiana law, the standard of care applicable to a physician is also applicable to a physician assistant); Andrews v. United States, 548 F. Supp. 603, 611 (D. S. C. 1982) (applying standard of care applicable to physicians under South Carolina law to physician assistant).

Our close review of Tennessee's statutes, which are similar to those of Delaware,[19] convinces us that the General Assembly did not intend that physician assistants be held to the

---

[19] See Del. Code Ann. tit. 24, §§ 1770A to 1774C (West, Westlaw through 77 Laws 2010 chs. 1-255).

same standard of care as physicians when administering medical care. Rather, a fair reading of the Act, and the Rules promulgated thereunder, establishes that a Tennessee physician assistant is a medical provider who practices medicine within a specifically circumscribed scope of practice, under the close supervision of a medical doctor, and pursuant to a specific protocol developed with the supervising medical doctor. And, although we recognize that physician assistants exercise a degree of independent judgment in providing medical services, the Act makes clear that physician assistants do not have the same autonomy that is accorded to doctors. Physician assistants are statutorily limited to performing "only those tasks that are within the physician assistant's range of skill and competence." Tenn. Code Ann. § 63-19-106(a)(3). Moreover, physician assistants are exposed to disciplinary action for practicing medicine without a license if they render professional services in a manner inconsistent with the Act. Id. § 63-19-108. It is logically inconsistent to impose significant limitations on physician assistants and yet simultaneously hold them to the same standard of care imposed upon their supervisors.

As the Wilson court observed, common sense also argues against holding a medical provider to a standard of care he or she has not been educated or trained to meet. As noted above, physician assistants are required only to be graduates of a physician assistant training program and to successfully complete "the examination of the National Commission on the Certification of Physician Assistants." Id. § 63-19-105(a)(2). In contrast, before a physician will be issued a license to practice medicine in Tennessee, he or she must have graduated from a medical school and must have completed satisfactorily an approved one-year training program. Id. § 63-6-207(a)(1)(A), (C) (Supp. 2009).[20] Physicians must also pass an examination administered by the Board of Medical Examiners. Id. at (b). Clearly, by both statute and common knowledge, physician assistants and physicians are not equivalent categories of health care providers. See McLean, supra, at 259-60 (discussing the significant differences in education and training between physician assistants and physicians and observing that "to conclude that the care rendered by the average physician is the same as the care rendered by the average physician [assistant] is, at best, naive"). If physician assistants were as capable of practicing medicine as physicians are, physician assistants would not require the close supervision of physicians. See MacDonald v. United States, 853 F. Supp. 1430, 1438 (M.D. Ga. 1994) (observing that a physician's assistant is not "an acceptable substitute for a doctor" because "[t]wo years of study as a physician's assistant does not operate as a sufficient substitute for the extensive study and training required to become a doctor," and recognizing that "[i]t is because doctors have undergone this extensive study and training that they have the responsibility to perform adequate oversight over physician's assistants in their charge").

---

[20] These requirements apply to graduates of United States or Canadian medical schools. The requirements for graduates of international medical schools are set forth in subsection (a)(2).

19

Finally, we accord special significance to the Tennessee Board of Medicine's internal rule that a physician assistant's standard of care is established, at least in part, pursuant to the written protocol developed between the physician assistant and his or her supervising physician. Tenn. Comp. R. & Regs. .0880-02-.18(5)(b), (6). This provision clearly implies that the physician assistant's standard of care is not identical to that of the supervising doctor.

Given that the profession of physician assistants is distinct from that of physicians, we believe that Tennessee's medical malpractice statute, Tenn. Code Ann. § 29-26-115(a), contemplates that the "recognized standard of acceptable professional practice" for physician assistants is that of physician assistants, not physicians. Accordingly, we agree with those authorities who differentiate between the standard of care which must be met by physicians and the standard of care which must be met by physician assistants.[21]

We hold that a physician assistant must be held to the "recognized standard of acceptable professional practice in the profession" of physician assistants and any specialty thereof, and not to a standard applied to physicians. This is consistent with Tennessee's long-standing recognition that, in a professional malpractice action, the defendant "is responsible for any damage which may result to those who employ him from the want of the necessary and proper knowledge, skill, and science which *such profession* demands." Wood v. Clapp, 36 Tenn. (4 Sneed) 65, 66 (1856) (emphasis added). Thus, "[p]rofessionals are judged according to the standard of care required by *their [own] profession*." Dooley v. Everett, 805 S.W.2d 380, 384-85 (Tenn. Ct. App. 1990) (emphasis added); see also Restatement (Second) of Torts, § 299A (1965) ("Unless he represents that he has a greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."). The profession of physician assistants is distinct from the profession of physicians. Therefore, in order to establish that a physician assistant has committed medical malpractice, the plaintiff must adduce testimony by an expert who is qualified to testify about (1) the standard of care applicable to physician assistants and (2) whether the physician assistant in question exercised "'the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession.'" Godbee v. Dimick, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006) (quoting Hopper v. Tabor, No. 03A01-9801-CV-00049, 1998 WL 498211, at *3 (Tenn. Ct. App. Aug. 19, 1998)).

---

[21] Although the Court of Appeals held in this case that Maddox's standard of care was identical to Dr. Adams's, at least some litigants in Tennessee medical malpractice cases have proceeded on the assumption that the standards of care are distinct. See, e.g., Watkins v. Affiliated Internists, P.C., No. M2008-01205-COA-R3-CV, 2009 WL 5173716, at *16-18 (Tenn. Ct. App. Dec. 29, 2009) (no issue raised about difference in standards of care but only about whether proposed physician assistant expert satisfied the locality rule).

**Summary Judgment Based on the Actions of Maddox:**
**the Need for Competent Expert Testimony**

We come now to the procedural status of this case. Plaintiff's complaint is one for medical malpractice, a specific type of negligence. The elements of a medical malpractice claim are set forth in Tennessee Code Annotated section 29-26-115, which provides, in pertinent part, as follows:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;[22]

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (Supp. 2009). This statute "'codifies the common law elements of negligence – duty, breach of duty, causation, proximate cause, and damages. No claim for negligence can succeed in the absence of any one of these elements.'" Kelley, 133 S.W.3d at 592 (quoting Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993)). Pursuant to this statute, a medical malpractice plaintiff must establish four elements in order to be successful: (1) the applicable standard of care; and (2) a breach of the applicable standard of care that (3) proximately caused (4) injuries to the plaintiff. The medical malpractice statute extends to the "acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient." Gunter v. Lab. Corp. of America, 121 S.W.3d 636, 640 (Tenn. 2003).

The elements of a medical malpractice claim generally must be established through competent expert testimony.[23] Moon v. St. Thomas Hosp., 983 S.W.2d 225, 229-30 (Tenn.

---

[22] For convenience, courts and litigants frequently refer to the "recognized standard of acceptable professional practice in the profession" as the "standard of care."

[23] One exception to the requirement of expert testimony arises when the health care provider's "alleged acts of negligence are so obvious that they come within the common knowledge of laymen." Kennedy v. Holder, 1 S.W.3d 670, 672 (Tenn. Ct. App. 1999). That exception is not at issue in this case.

21

1998); <u>Payne v. Caldwell</u>, 796 S.W.2d 142, 143 (Tenn. 1990).  Subsection -115(b) sets forth the prerequisites that must be met before an expert witness will be deemed competent to testify about any of the elements of a medical malpractice claim:

> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.  This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses.  The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115(b).  Where the proffered witness is a medical doctor, this statutory test of competency requires that the doctor be licensed to practice, and had recently practiced, "a profession or specialty which would make the person's expert testimony relevant to the issues in the case."  <u>Id.</u>  That is, the doctor's (licensed) practice must provide her with sufficient experience to make her knowledgeable about the issues which are the subject of her testimony.

Our Court of Appeals has recognized that this statutory provision requires the proffered expert to have "a sufficient basis on which to establish familiarity with the defendant's field of practice and the standard of care required in dealing with the medical care at issue."  <u>Bravo v. Sumner Regional Health Systs., Inc.</u>, 148 S.W.3d 357, 367 (Tenn. Ct. App. 2003). Thus, before a trial court will admit testimony by a proffered expert witness about the standard of care applicable to a defendant, the trial court must be satisfied that the witness is competent to testify.  In the context of the instant case, Plaintiff was required to present expert testimony from a competent witness establishing (1) the standard of care Maddox was required to meet, (2) the manner in which his conduct failed to meet the standard of care, and (3) how Maddox's failure to meet the standard of care proximately caused Plaintiff to suffer injuries she would not have suffered otherwise.  <u>White v. Vanderbilt Univ.</u>, 21 S.W.3d 215, 226-27 (Tenn. Ct. App. 1999).[24]

---

[24] We emphasize that an expert witness qualified to testify about a physician assistant's standard of care may be someone other than a physician assistant.  For instance, a medical doctor who is sufficiently familiar with the physician assistant practice at issue may be qualified to testify about the physician assistant's standard of care.

22

A defendant may put a plaintiff's medical malpractice case to the test by filing a motion for summary judgment. The defendant will be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A defendant moving for summary judgment bears the ultimate burden of demonstrating that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Hannan v. Alltel Publishing Co., 270 S.W.3d 1, 5 (Tenn. 2008). When, however, the moving defendant's motion is properly supported, "the burden of production then shifts to the [plaintiff] to show that a genuine issue of material fact exists." Id. A defendant moving for summary judgment shifts the burden of production to the plaintiff by either (1) affirmatively negating an essential element of the plaintiff's claim, or (2) showing that the plaintiff cannot prove an essential element of his or her claim at trial. Id. at 8-9.

In this case, Defendants' motion for summary judgment is supported by competent expert proof via affidavits from Maddox and Dr. Adams affirmatively negating that either Maddox or Dr. Adams breached the applicable standards of care. This proof effectively shifted the burden of production to Plaintiff to demonstrate through competent expert proof that there is a genuine issue of material fact about whether Maddox or Dr. Adams breached the applicable standard of care. In response to Defendants' motion for summary judgment, and in support of her allegation that Maddox/Dr. Adams breached the applicable standard of care by misdiagnosing her ailment and thereby proximately causing her injuries, Plaintiff relies solely on the deposition testimony of Dr. Nelson Mangione, the cardiologist who performed her surgery. Dr. Mangione testified that Maddox breached the standard of care applicable to primary care physicians. Dr. Mangione admitted, however, that he was not familiar with the standard of care applicable to physician assistants or with the standard of care which a supervising physician must meet when supervising a physician assistant. On this basis, the trial court determined that Dr. Mangione's testimony did not satisfy Plaintiff's burden of production/proof. In essence, the trial court determined that Dr. Mangione was not competent to testify about Maddox's standard of care. We will overturn a trial court's rulings regarding the admissibility of an expert's proffered testimony only upon an abuse of discretion. See Robinson v. LeCorps, 83 S.W.3d 718, 724-25 (Tenn. 2002).

In this case, the trial court did not abuse its discretion in determining that Dr. Mangione was not competent to testify about the standard of care actually applicable to Maddox.[25] Dr.

[25]The parties in this case refer in their briefs to Tennessee Rules of Evidence 702 and 703, both of which deal with the admissibility of expert testimony. The trial court did not refer to either of these Rules in its decision granting Defendants summary judgment. We emphasize that, in medical malpractice cases, the threshold issue for expert testimony is whether the proffered expert is competent to testify pursuant to subsection (b) of the medical malpractice statute, set forth above. We acknowledge that the statutory

Mangione admitted as much himself. Plaintiff presented no other proof on the subject. Plaintiff therefore failed to rebut the proof adduced by Defendants in conjunction with their motion for summary judgment. Accordingly, the trial court was correct in awarding summary judgment to Defendants based on the alleged negligence of Maddox.

## Summary Judgment as to Dr. Adams

Although the Complaint may be read to assert a cause of action for malpractice directly against Dr. Adams,[26] Plaintiff has not actually asserted in this case that Dr. Adams independently committed any acts constituting malpractice in her direct care; in fact she emphasizes that he did not care for her or speak to her in person during the months in question. Moreover, Dr. Mangione opined that Dr. Adams did not breach the standard of care applicable to primary care physicians. Thus, summary judgment is appropriate as to Dr. Adams on this basis as well.

Negligent supervision is the last potential theory of liability by which Dr. Adams might be legally responsible for Maddox's negligence. See, e.g., Watkins v. Affiliated Internists, P.C., No. M2008-01205-COA-R3-CV, 2009 WL 5173716, at *21-28 (Tenn. Ct. App. Dec. 29, 2009); MacDonald, 853 F. Supp. at 1438; Gore, supra, at 133-35. Indeed, in her brief to this Court, Plaintiff makes references to Dr. Adams's alleged negligent supervision of Maddox. This independent theory of liability was not raised in Plaintiff's complaint, however, and therefore it may not be raised for the first time on appeal. See Draper v. Westerfield, 181 S.W.3d 283, 292 (Tenn. 2005).

## CONCLUSION

The professional standard of care applicable to physician assistants is distinct from that applicable to physicians. Because Plaintiff introduced no expert proof as to any violation of the applicable standard of care, the trial court was correct in its ruling that Defendants are entitled to summary judgment. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court's award of summary judgment in favor of Defendants. The case is therefore dismissed.

---

competency requirements are similar to those set forth in Tennessee Rule of Evidence 702: "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Nevertheless, we stress that medical malpractice cases are unique and that the competency requirements for expert witnesses are distinct in these cases, including the locality rule.

[26] Our Court of Appeals has recognized that the regulations applicable to physicians who supervise physician assistants "create[] a direct duty to the patient to review the patient's data and chart and make an independent judgment as to the appropriate treatment." Watkins, 2009 WL 5173716, at *27 n.17.

The costs of this cause are taxed to Plaintiff, Melissa Michelle Cox, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE