IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 13, 2014 Session

## MARCHELLE BUMAN, EXECUTOR OF THE ESTATE OF KENNETH JENKINS

v.

## ALYCIA D. GIBSON, P.A., THOMAS PAUL EVANS, M.D., ANDREW H. LUNDBERG, M.D., AND PARIS SURGICAL SPECIALISTS, PLLC

Appeal from the Henry County Circuit Court
No. 40CC1-2011-CV-3429    C. Creed McGinley, Judge

No. W2013-01867-COA-R3-CV - Filed August 11, 2014

This is a health care liability action involving a physician's duties when supervising a physician's assistant. The plaintiff alleged the supervising physician negligently supervised a physician's assistant which resulted in the eventual amputation of the plaintiff's leg. The physician moved for summary judgment, contending that he complied with all statutory duties. The plaintiff responded to this motion and simultaneously moved to amend her complaint to allege that the physician was vicariously liable for the negligent actions of the physician's assistant. The trial court denied the plaintiff's request to amend her complaint and granted the physician's motion for summary judgment. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

PAUL G. SUMMERS, SR. J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and J. STEVEN STAFFORD, J., joined.

Al H. Thomas and Aaron L. Thomas, Memphis, Tennessee for Plaintiff/Appellant Marchelle Renee Buman, Executor of the Estate of Kenneth Jenkins

William H. Haltom, Jr., Memphis, Tennessee for the Defendant/Appellee Thomas Paul Evans, M.D.

**OPINION**

**FACTS AND PROCEEDINGS BELOW**

This appeal stems from a health care liability action based on a physician's alleged negligent

supervision of a physician's assistant.

In late January 2010, Kenneth Jenkins ("Jenkins") sought treatment from Defendant Alycia Gibson ("Gibson"), a physician's assistant employed by the McCoy Medical Clinic in Paris, Tennessee, for ulcers on his right foot sustained as a result of a pedicure. Gibson treated Jenkins for his foot ulcers on a periodic basis several times between January 27, 2010 and March 17, 2010.[1] Generally, the treatment consisted of an ultrasound, to better his circulation, and dressing of the wound to protect it from further injury. During the next few weeks, Jenkins' foot wound had not healed, but "was stable" and generally "was the same" from visit to visit. Though Jenkins was apparently in significant pain, he was not running a fever and Gibson believed at that time that "we could get his foot well." On March 17, 2010, Gibson referred Jenkins to a vascular surgeon, Defendant Andrew Lundberg, M.D., to check the blood flow to Jenkins' foot.[2] Dr. Lundberg saw and began treating Jenkins on April 5, 2010; both Gibson and Dr. Lundberg continued to treat Jenkins until August 2010. Unfortunately, in August 2010, Jenkins' leg was amputated below the knee.

At all times relevant to this appeal, Defendant/Appellee Dr. Thomas Paul Evans ("Dr. Evans") served as Gibson's supervising physician. As her supervising physician, it is undisputed that Dr. Evans and Gibson jointly developed policies and protocols for Gibson's work, reviewed these protocols together on a periodic basis, and Dr. Evans was available for consultation with Gibson at all times regarding Jenkins' care. Additionally, it is undisputed that Dr. Evans personally reviewed 30% of the charts Gibson wrote and monitored, once every one or two weeks. Dr. Evans also visited the clinic, where Gibson practices, and reviewed charts brought to him by Gibson. It is undisputed that Dr. Evans never saw or treated Jenkins and that Gibson never consulted him regarding treatment of Jenkins. Dr. Evans did review and approve entries Gibson made to Jenkins' medical chart on three occasions: on March 17, 2010, which contained the referral to Dr. Lundberg; on April 5, 2010; and on April 7, 2010.

On July 15, 2011, Jenkins and his then wife Euliene Jenkins filed the instant health care liability action against several health care providers, alleging negligence in the treatment of his foot wound that eventually resulted in the amputation. Specifically, Jenkins' complaint alleged Gibson was "negligent in not referring Kenneth Jenkins to a specialist in a timely

---

[1] Gibson was also treating Jenkins for a wound on his hand and it is unclear how many visits during this time period his foot was also treated. As Gibson explained, he told her about the foot sores on January 22, 2010 but apparently did not let Gibson treat them until January 27, 2010.

[2] Gibson claimed she attempted to refer Jenkins to Dr. Lundberg "probably a month after his foot had the ulcers on them" but this was not documented in Jenkins' medical chart.

manner by waiting 2 months to refer him to a specialist." At that time, Dr. Evans was not named as a defendant.

Unfortunately, shortly thereafter, Jenkins passed away from causes not related to this action, and Plaintiff/Appellant Marchelle Renee Buman ("Buman"), the executrix of the estate of Kenneth Jenkins, was substituted as the plaintiff.[3]

In September 2011, Buman filed a motion to amend the complaint to add Dr. Evans as a defendant. Though the record does not contain an order granting this motion, Buman filed a subsequent amended complaint on January 26, 2012. In the amended complaint, Buman alleges that Dr. Evans "is believed to be the supervisor of [Gibson] and responsible for her treatment of [Jenkins]." As it pertained to Dr. Evans's alleged negligence, the amended complaint stated as follows:

> Defendant Dr. Thomas Paul Evans, M.D., believed to be the supervisor of [Gibson] and responsible for her treatment of Kenneth Jenkins, knew or should have known that Kenneth Jenkins's wound treatment was not effective and the wound was worsening. Dr. Evans was negligent in not ensuring that Kenneth Jenkins received effective treatment and in not ensuring that he was referred to a specialist in a timely manner.

> The treatment that [Gibson] and Dr. Evans rendered to Kenneth Jenkins was rendered as employees of Defendant McCoy Medical, Inc., which is accordingly vicariously liable for the aforementioned negligence of [Gibson] and Dr. Evans.

Dr. Evans answered, admitting that he was Gibson's supervising physician, but denying that he acted negligently.

Discovery ensued and the depositions of all parties and Buman's designated medical expert, Dr. Martin Evans ("Expert Evans"), were taken.[4]

---

[3] In August 2012, the trial court entered an order dismissing all claims brought by Euliene Jenkins, primarily loss of consortium, based on the fact that Euliene and Kenneth Jenkins were not married at the time of the alleged negligent treatment in this matter. This being the case, plaintiff Buman, as executrix of Jenkins' estate, proceeded as the sole plaintiff in this matter.

[4] To avoid confusion we have designated Dr. Thomas Paul Evans as "Dr. Evans" and Dr. Martin Evans as "Expert Evans."

During these depositions, Dr. Evans confirmed that he served as Gibson's supervising physician since 2009 and during her treatment of Jenkins. Dr. Evans explained that generally his duties as a supervising physician are "to formulate protocols together with the PA to approve those protocols and make sure they conform to the standard of care . . . [and] are applied in a clinical setting." He also explained that his clinic pulls 30% of the charts for him to review, which he does usually every Sunday, asks any questions if he has them, and signs the charts. He confirmed that he only reviews the 30% of charts pulled and the patient cases that physician's assistants present to him. He acknowledged that Jenkins' chart was pulled for him on three occasions and that he reviewed and signed the records.

With respect to his practice, Dr. Evans stated that his primary practice consists of general internal medicine and pediatrics, and that "probably 5 percent" of his practice is devoted to wound care. He explained that "a great majority of what [Gibson] does [is wound care]" but he did not know if it was 100% wound care.

Gibson also testified that she and Dr. Evans have developed policies and protocols together and review them on a periodic basis. She also explained that Dr. Evans is always prompt in his responses to her inquires and is available when she needs to consult with him on any patient care. With respect to Jenkins' care specifically, she explained that she did not consult with Dr. Evans or feel the need to discuss Jenkins' care with him because he had another doctor. She explained as follows: "I discussed it with his doctor because that's who referred him to me. I don't – I try not to discuss with Dr. Paul [Evans] because it's not his patient; it's the referring physician's patient. If you discuss your referring physician's patient with another doctor, they'll stop referring to you."

Buman's medical expect, Expert Evans was also deposed. He explained that he is a general and vascular surgical specialist in Richmond, Virginia, and has served as a supervising physician there. When asked to discuss what he believed Dr. Evans failed to do, Expert Evans acknowledged that Dr. Evans reviewed charts in accordance with Tennessee law, but he contended that Dr. Evans should have also looked over Gibson's logs in order to fully understand who she was treating and for what diagnoses. He opined that he believed the failure of a supervising physician to review logs was inadequate, but noted that this was "from the medical side, not the legal side."

When asked whether he believed if Gibson's referral to Dr. Lundberg had been timely, would the eventual outcome have been changed, Expert Evans stated that, during the time frame that Jenkins was not referred, tissue was lost and Jenkins was in a lot of pain, but the outcome likely would not have been different. He explained that Jenkins' leg was salvageable when Gibson referred him to Dr. Lundberg and when asked if anything Gibson

did or failed to do contributed to Jenkins losing his leg, Expert Evans stated as follows:

> All I said was that had the referral been timely, he would have done without pain for two months; had the referral been timely, the amount of tissue destruction would have been less. You're trying to link an exact action that she did or didn't do to the exact failure of the leg, and I can't link those one to one. All I can say is that there would have been less tissue loss, less destruction and less pain, that's all I can say.

At the conclusion of these depositions, the trial court set a trial date in this matter for August 5, 2013.[5] However, prior to this August trial date, on January 16, 2013, Dr. Evans filed a motion for summary judgment. In an attached affidavit, Dr. Evans states that he "reviewed and consulted with [Gibson] only in 30 percent of her patient cases, and I reviewed only the patient cases she presented to me." Dr. Evans, in reliance upon Expert Evans' testimony, goes on to argue that there was no expert testimony whatsoever that could link either Gibson or Dr. Evans' alleged negligence to Jenkins' lost leg.

A few weeks later on February 5, 2013, Buman simultaneously filed a response to Dr. Evans' summary judgment motion and a separate motion seeking to file a Second Amended Complaint, "to more clearly plead" a claim of vicarious liability against Dr. Evans. Dr. Evans filed a response in opposition to the motion to amend the complaint.

On May 30, 2013, the trial court held a hearing on Dr. Evans' motion for summary judgment and Buman's motion to amend the complaint. During this hearing, the trial court heard arguments from both parties and orally ruled as follows at the conclusion of their arguments:

> The Court earlier granted summary judgment on behalf of McCoy Medical the last time we had a hearing. And at the time I was hearing motions that day I indicated that I had some grave concerns concerning the viability of the claim against Dr. Paul Evans.
>
> There's been further information furnished to the Court, further memorandum advising, and I -- in all candor I told the Plaintiffs that I thought they had a very difficult position to maintain in order to have any type of liability for Dr. Thomas Paul Evans. The Court remains of that opinion today. If the Court were not to grant summary judgment it would almost be an imposition of strict

---

[5] We note that though it has not been pointed out by either party, in the Agreed Scheduling Order setting this trial date, the parties were given until March 15, 2013 to amend their pleadings.

liability on any supervising physician that was supervising a PA. The Court finds that there's no genuine issue of material fact under any of the theories that are proposed of vicarious responsibility of Dr. Evans in his supervisory capacity. So, therefore, no genuine issue of facts, summary judgment is granted.

The trial court also went on to orally rule on Buman's motion to amend her complaint, reasoning as follows: "An Amended Complaint wouldn't affect the way that the Court is ruling on this. I feel that it's appropriate for summary judgment. So if you'll draft the Order to that effect."

On July 19, 2013, the trial court entered two separate orders. The first order, granting Dr. Evans' motion for summary judgment stated as follows:

> The Court having reviewed the Affidavits filed herein as well as the pleadings and memoranda submitted by the parties, and the Court having heard argument of counsel, from all of which the Court finds that under the uncontroverted evidence in this case, Defendant Thomas Paul Evans, M.D. met and fulfilled all his responsibilities under Tennessee law as a supervising physician of a physician's assistant, and that there is no genuine issue of material fact upon which the liability of Defendant Thomas Paul Evans, M.D., can be predicated, and he is entitled to judgment as a matter of law.

Based on this, the trial court, finding no just reason for delay, certified this ruling as final pursuant to Rule 54.02.

Additionally, the trial court's second order denied Buman's motion to amend her complaint, finding the claim for vicarious liability was not previously asserted and relying on untimeliness of the motion to amend as the basis for its decision to deny the motion:

> [U]pon the motion of the plaintiff for leave to amend her complaint to raise a previously-unasserted cause of action against Defendant Thomas Paul Evans, M.D., specifically that he was vicariously liable for the alleged negligence of co-defendant Alycia Gibson, P.A. The Court finds that the proposed amendment was not timely filed and is in effect an effort to interject a new claim against Dr. Evans some two years into the lawsuit and just weeks before the scheduled trial date, and therefore the motion should be denied[.]

From these orders, Buman appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Buman raises the following issues on appeal:

> 1) Did the Circuit Court err in granting Dr. Evans summary judgment based on its finding that Dr. Evans fulfilled all his statutory and regulatory responsibilities?
>
> 2) Did the Circuit Court err in ruling as a matter of law that Dr. Evans fulfilled all his statutory and regulatory responsibilities?
>
> 3) Did the Circuit Court err in ruling as a matter of law that Dr. Evans fulfilled all his statutory and regulatory responsibilities by virtue of his undisputed monthly review of 30% of his physician assistant's charts?
>
> 4) Did the Circuit Court err in ruling that a supervising physician's compliance with all the duties listed in T.C.A. § 63-19-106 and with all the regulations promulgated pursuant to that statute immunizes that physician from common-law negligence for deviating from the standard of care?
>
> 5) Did the Circuit Court err in ruling that the decision of the Supreme Court of Tennessee in *Cox v. M.A. Primary and Urgent Care Clinic, et al.*, 313 S.W.3d 240 (Tenn. 2010)[,] does not impose vicarious liability on a supervising physician?
>
> 6) Did the Circuit Court err in ruling that the complaint did not state a claim for vicarious liability?
>
> 7) Did the Circuit Court abuse its discretion in not allowing Plaintiff to amend the complaint to allege vicarious liability when the amendment would only add an additional legal theory of recovery to the facts already alleged?

This matter comes to us upon the trial court's grant of Dr. Evans' motion for summary judgment. A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." ***Green v. Green***, 293 S.W.3d

493, 513 (Tenn. 2009) (citing ***Martin v. Norfolk S. Ry.,*** 271 S.W.3d 76, 83 (Tenn. 2008)). "If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." ***Green,*** 293 S.W.3d at 514 (citing ***Martin***, 271 S.W.3d at 84; ***Louis Dreyfus Corp. v. Austin Co.***, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993)). "If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law." ***Green,*** 293 S.W.3d at 514 (citing ***Godfrey v. Ruiz***, 90 S.W.3d 692, 695 (Tenn. 2002)).

Because this lawsuit was filed after July 1, 2011, resolution of the motion for summary judgment is governed by Tennessee Code Annotated § 20-16-101, which provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101. Our review of the trial court's ruling on a summary judgment motion is *de novo* with no presumption of correctness given to the conclusion of the trial court; therefore, we must make a fresh determination that the requirements of Rule 56 have been satisfied in each case. ***Dick Broad Co. v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 671 (Tenn. 2013); ***Green***, 293 S.W.3d at 514. This Court also must consider the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in the non-moving party's favor, and disregard all countervailing evidence. ***Green***, 293 S.W.3d at 514 (citing ***Cumulus Broad., Inc. v. Shim***, 226 S.W.3d 366, 373-74 (Tenn. 2007)); ***see also Cox v. M.A. Primary & Urgent Care Clinic***, 313 S.W.3d 240, 248 (Tenn. 2010).

Additionally, the grant or denial of a motion to amend is within the sound discretion of the trial court and will be reversed only for an abuse of discretion. ***Merriman v. Smith***, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979) (citing ***Zenith Radio Corp. v. Hazeltine Research***, Inc., 401 U.S. 321 (1971)). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85

(Tenn. 2001). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court, and a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." ***Eldridge***, 42 S.W.3d at 85; ***see also Pratcher v. Methodist Healthcare Memphis Hospitals***, 407 S.W.3d 727, 741 (Tenn. 2013).

## ANALYSIS

On appeal, Buman raises several arguments contending that the trial court's grant of summary judgment was improper in this case. We will attempt to address each argument in turn.

First, Buman argues that Tennessee Code Annotated 63-19-106(a)(1),[6] which states in

---

[6] Tennessee Code Annotated § 63-19-106 states in its entirety as follows:

(a) A physician assistant is authorized to perform selected medical services only under the supervision of a licensed physician.

(1) Supervision requires active and continuous overview of the physician assistant's activities to ensure that the physician's directions and advice are in fact implemented, but does not require the continuous and constant physical presence of the supervising physician. The board and the committee shall adopt, by September 19, 1999, regulations governing the supervising physician's personal review of historical, physical and therapeutic data contained in the charts of patients examined by the physician assistant.

(2) The range of services that may be provided by a physician assistant shall be set forth in a written protocol, jointly developed by the supervising physician and the physician assistant. The protocol shall also contain a discussion of the problems and conditions likely to be encountered by the physician assistant and the appropriate treatment for these problems and conditions. The physician assistant shall maintain the protocol at the physician assistant's practice location and shall make the protocol available upon request by the board of medical examiners, the committee on physician assistants or the authorized agents of the board or the committee.

(3) A physician assistant may perform only those tasks that are within the physician assistant's range of skills and competence, that are within the usual scope of practice of the supervising physician and that are consistent with the protection of the health and well-being of the patients.

(4) The physician assistant may render emergency medical service in

-9-

relevant part, imposes two separate duties on supervising physicians:

> (a) A physician assistant is authorized to perform selected medical services only under the supervision of a licensed physician.
>
> (1) Supervision requires active and continuous overview of the physician assistant's activities to ensure that the physician's directions and advice are in fact implemented, but does not require the continuous and constant physical presence of the supervising physician. The board and the committee shall adopt, by September 19, 1999, regulations governing the supervising physician's personal review of historical, physical and therapeutic data contained in the charts of patients examined by the physician assistant.

Tenn. Code Ann. § 63-19-106(a)(1). Buman contends the first sentence of subsection (1) requires that supervising physicians maintain an "active and continuous overview of the physician assistant's activities." In addition to that broad duty, Buman contends that physicians have a separate and distinct duty to also follow all regulations promulgated by the Board of Medical Examiners and its committee found in Regulation 0880-02-.18, which specifically governs the supervision of physician's assistants and requires a specific review of the physician's assistant's charts.[7] Tenn. Comp. R. & Regs. 0880-02-.18.

---

> accordance with guidelines previously established by the supervising physician pending the arrival of a responsible physician in cases where immediate diagnosis and treatment are necessary to avoid disability or death.
>
> (b) A physician assistant shall function only under the control and responsibility of a licensed physician. The supervising physician has complete and absolute authority over any action of the physician assistant. There shall, at all times, be a physician who is answerable for the actions of the physician assistant and who has the duty of assuring that there is proper supervision and control of the physician assistant and that the assistant's activities are otherwise appropriate.
>
> (c) Any rules that purport to regulate the supervision of physician assistants by physicians shall be jointly adopted by the board of medical examiners and the committee on physician assistants.

Tenn. Code Ann. § 63-19-106 (2010).

[7] Regulation 0880-02.18 states in its entirety as follows:

> The following requirements apply to a supervising physician who supervises one or more

physician assistants:

(1) A supervising physician or a substitute supervising physician must possess a current, unencumbered license to practice in the state of Tennessee.

(2) Supervision does not require the continuous and constant presence of the supervising physician; however, the supervising physician must be available for consultation at all times or shall make arrangements for a substitute physician to be available.

(3) A supervising physician and/or substitute supervising physician shall have experience and/or expertise in the same area of medicine as the physician assistant.

(4) Physician assistants who hold temporary licenses pursuant to T.C.A. § 63-19-105(a)(2) (those waiting to take the licensure examination) may not provide services unless a supervising physician is on site while the services are being provided.

(5) Protocols are required and:

> (a) shall be jointly developed and approved by the supervising physician and physician assistant;
> (b) shall outline and cover the applicable standard of care;
> (c) shall be reviewed and updated biennially;
> (d) shall be maintained at the practice site;
> (e) shall account for all protocol drugs by appropriate formulary;
> (f) shall be specific to the population seen;
> (g) shall be dated and signed; and
> (h) shall be made available upon request for inspection by the board or committee.

(6) The supervising physician shall be responsible for ensuring compliance with the applicable standard of care under (5). Additionally, the supervising physician shall develop protocols in collaboration with the physician assistant to include a method for documenting consultation and referral.

(7) Within ten (10) business days after the physician assistant has examined a patient who falls in one of the following categories, the supervising physician shall make a personal review of the historical, physical, and therapeutic data gathered by the physician assistant on that patient and shall so certify in the patient's chart within thirty (30) days:

> (a) when medically indicated;
> (b) when requested by the patient;
> (c) when prescriptions written by the physician assistant fall outside the protocols;
> (d) when prescriptions are written by a physician assistant who possesses a temporary license; and

-11-

Buman argues summary judgment was not appropriate in this case because, while Dr. Evans may have reviewed Gibson's charts and performed other duties in accordance with the regulations, he failed to prove he maintained "active and continuous overview" of Gibson's activities throughout her treatment of Jenkins for summary judgment purposes.

Conversely, Dr. Evans contends that he provided uncontroverted evidence that he "met each and every one of his responsibilities for a supervising physician for a physician's assistant under Tennessee law" and lists his completion of the specific requirements under Regulation 0880-02-.18.

In order to address Buman's contention, we are required to interpret Section 63-19-106 to

---

(e) when a controlled drug has been prescribed.

(8) In any event, a supervising physician shall personally review at least twenty percent (20%) of charts monitored or written by the physician assistant every thirty (30) days.

(9) The supervising physician shall be required to visit any remote site at least once every thirty (30) days.

(10) If more than one physician supervises a physician assistant in a practice setting (such as in a hospital emergency room), one protocol may be developed for that practice setting.

(11) If a physician assistant and the same supervising physician work in more than one practice setting, one protocol may be developed which covers all these practice settings.

(12) The number of physician assistants for whom a physician may serve as the supervising physician shall be determined by the physician at the practice level, consistent with good medical practice.

(13) The supervising physician may delegate to a physician assistant working under the physician's supervision the authority to issue prescriptions or medication orders for legend drugs and controlled substances listed in Schedules II, III, IV, and V of Tennessee Code Annotated, Title 39, Chapter 17, Part 4 in accordance with written protocols which are mutually developed and agreed upon by the physician assistant and the supervising physician.

(14) A licensed physician who supervises the services of a physician assistant in a manner that is inconsistent with the Tennessee Medical Practice Act or these rules shall be subject to disciplinary action.

Tenn. Comp. R. & Regs. 0880-02-.18

determined what duties are required for compliance. It is well-settled that the guiding principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *Seals v. H & F, Inc.,* 301 S.W.3d 237, 241-42 (Tenn. 2010); *State v. Sliger,* 846 S.W.2d 262, 263 (Tenn. 1993). In seeking to ascertain legislative intent, we must look to the entire statute in order to avoid any forced or subtle construction of the pertinent language. *McClain v. Henry I. Siegel Co.,* 834 S.W.2d 295 (Tenn. 1992). We presume that every word in a statute has meaning and purpose and give full effect to each if so doing does not violate the legislature's obvious intent. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005).

Finding each parties' interpretation of a supervising physician's duties under Section 63-19-106(a)(1) plausible, we find the use of general rules of statutory construction helpful to aid our analysis. Specifically, we note that where the mind of the Legislature has been turned to the details of a subject and they have acted upon it, a statute treating the subject in a general manner should not be considered as intended to affect the more particular provision, especially where the special provision follows the general provision. *See Woodroof v. City of Nashville*, 192 S.W.2d 1013 (Tenn. 1946); *see also* Tenn. Code Ann. § 1-3-103; *Arnwine v. Union Cnty. Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn. 2003).

Based on our analysis, we find that it was not the Legislature's intent to set forth two distinct duties, as Buman suggests. Rather, we find that second sentence referencing the specific regulations merely elaborates on the broader general goal intended by the Legislature and sets forth how this broader goal of "active and continuous overview of the physician assistant's activities" is to be specifically accomplished. Thus, we find that by presenting evidence demonstrating Dr. Evans' compliance with the specific regulations referenced in the second sentence, he has sufficiently proven that he maintained "active and continuous overview" of Gibson's activities sufficient for a grant of summary judgment. Therefore, Buman's argument is without merit.

We now turn to Buman's next argument on appeal. Buman contends that Dr. Evans failed to present proof that he adhered to all statutory requirements under Regulation 0880-12-.18 (7), which lists five circumstances that trigger additional duties for the supervising physician. Buman, in reliance upon testimony from her medical expert, argues that review of Jenkins' chart was "medically indicated" and that Dr. Evans' "failed to personally review the chart of Kenneth Jenkins [and] . . . was not entitled to summary judgment." Dr. Evans contends, with respect to reviewing patients' medical charts, his review of 30% of Gibson's charts in compliance with subsection 8 is sufficient to meet all of his statutory requirements and summary judgment was appropriate.

-13-

We note that as a practical matter, supervising physicians are not required to review all the charts of all patients for which physicians' assistants care and treat. To require this would render the language of Tenn. Comp. R. & Regs. 0880-02-.18 (8) superfluous and undercut the rationale behind increasing the utilization of physician assistants.[8] Rather with the inclusion of Tenn. Comp. R. & Regs. 0880-02-.18 (7), five special categories were delineated to ensure, that when certain actions are taken by the physician's assistant or specific situations as assessed by the physician's assistant arise, the supervising physician will personally review the charts of these patients.

However, the way the current system is set up, a supervising physician cannot complete this task on his own; it is incumbent on the physician's assistant to recognize that such triggers have occurred and alert the supervising physician accordingly. Otherwise, the supervising physician, who is not personally interacting with the patient and only statutorily required to review 20% of the charts, would have no basis in which to determine which charts need special attention.[9] Because of this, we find there is an implied duty on the physician's assistants to bring the charts of the patients meeting these special categories to the supervising physicians' attention.

In our case, assuming arguendo, review of Jenkins' chart was in fact "medically indicated," the undisputed evidence in this case is that Gibson never brought this fact to Dr. Evans' attention. As explained by Gibson in her deposition, "in the care and treatment of Mr. Jenkins . . . [I] did not ever, in [my] judgment, feel a need to consult with [Dr. Evans] about the care and talk to him directly about it." Because Gibson never triggered a duty for Dr. Evans to comply with the requirements of Tenn. Comp. R. & Regs. 0880-02-.18 (7), he cannot be found negligent for his failure to adhere to this regulation, even if we were to assume review of Jenkins' chart was "medically indicated." Moreover, for reasons we will discuss in more detail below, Buman has not successfully plead that Dr. Evans was vicariously liable for the negligence of Gibson and cannot be found liable based on her potential negligence in failing to inform him that review was medically indicated. Finding no basis in which to find Dr. Evans liable under these circumstances, we also find this

___

[8]See *Cox v. M.A. Primary and Urgent Care Clinic*, 313 S.W.3d 240, 248 (Tenn. 2010), for a more comprehensive explanation of the benefits of utilizing physician's assistants.

[9] When mutually developing the written protocols agreed upon by the physician assistant and the supervising physician as required in Tenn. Comp. R. & Regs. 0880-02-.18 (5) and (6), it highly advisable for the protocol system to include a uniform method for handling cases that fall into these five specifically delineated categories. In this case, we have not been pointed to any evidence in the voluminous record that demonstrates that such a system was in place during the time in which the alleged negligence occurred or, if such a system was in place, it was Dr. Evans that strayed from the agreed upon procedure.

-14-

contention to be without merit.

Buman also suggests that summary judgment was not appropriate in this case because wound care was not within Dr. Evans' "usual scope of practice." Buman relies on Dr. Evans' undisputed testimony that only 5% of his practice involved wound care and this was not "usual" as set forth in Tennessee Code Annotated § 63-19-106(a)(3). As stated in ***Cox v. M.A. Primary and Urgent Care Clinic***, physician assistants were introduced to "perform numerous routine clinic procedures, thereby freeing physicians to concentrate on complex medical problems." ***Cox***, 313 S.W.3d 240, 247 (Tenn. 2010.) The fact that a physician is only spending 5% of his time on wound care is not significant. The fact that a physician assistant's job has a much higher percentage of wound care , thereby freeing up the physician for more complex medical tasks, demonstrates the statute is accomplishing the legislature's intended goals. Thus, we find this argument to also be without merit.

Finally, Buman argues that Section 63-19-106 and the regulations promulgated were not "intended to subsume and/or pre-empt all common-law duties of a supervising physician." Buman suggests that Dr. Evans should be liable for deviating from the professional standard of care in his supervision of Gibson under common law negligence even if it were shown that he complied with all his duties enumerated by the statute.

We disagree. When the Legislature "has acted to occupy an area of the law formerly governed by the common law, the statute must prevail over the common law in the case of conflict." ***Hodge v. Craig***, 382 S.W.3d 325, 338 (Tenn. 2012) (citing ***Knoxville Outfitting Co. v. Knoxville Fireproof Storage Co.***, 22 S.W.2d 354, 355 (Tenn. 1929)). "In areas of the law where the General Assembly has enacted statutes that clearly and definitively set boundaries on rights, obligations, or procedures, we have recognized that it should be left to the legislature to change those boundaries, if any are to be changed, and to define new ones." ***Hodge***, 382 S.W.3d at 338 (citing ***Taylor v. Beard***, 104 S.W.3d 507, 511 (Tenn. 2003)). Clearly, the Legislature definitively set forth what is required of a physician supervising a physician's assistant and therefore, it is not the place of this Court to impose additional burdens on a supervising physician. Moreover, we can find no basis under which Dr. Evans could be liable in this case for common law negligence as a non-supervising physician, as there is no doctor-patient relationship between Dr. Evans and Jenkins. Dr. Evans never saw, communicated with, or directly cared for Jenkins.

Although, we find the Legislature has specifically set forth how negligence of supervising physicians is to be defined under Section 63-19-106, we do acknowledge that the Tennessee Supreme Court made it clear in *Cox*, that a supervising physician could be held *vicariously* liable for the negligent supervision of a physicians' assistant if proven. ***Cox***, 313 S.W.3d at

254. After carefully reviewing Buman's original amended complaint adding Dr. Evans as a defendant, we, like the trial court, cannot find that this cause of action was initially alleged.

As referenced by Buman's clear reference to vicarious liability as it pertained to McCoy Medical, another defendant, the complaint is void of any reference to Dr. Evans' vicarious liability. Buman points to language in the complaint that states that Dr. Evans "is the supervisor of [Gibson] and responsible for her treatment of Kenneth Jenkins," arguing this is sufficient. However, after reviewing this complaint in its entirety, even with liberal pleading standards in mind, we cannot find that Buman has alleged that Dr. Evans was vicariously liable.

Likely recognizing this half-hearted assertion was insufficient, Buman attempted to file a motion to amend to specifically add vicarious liability as a cause of action. For reasons explained below, we do not find that the trial court abused its discretion in refusing to allow Buman to amend her complaint to add this cause of action.

Generally, when faced with a motion to alter or amend a complaint, "trial courts must give the proponent of a motion to amend a full chance to be heard on the motion and must consider the motion in light of the amendment policy embodied in Rule 15.01 of the Tennessee Rules of Civil Procedure that amendments must be freely allowed; and, in the event the motion to amend is denied, the trial court must give a reasoned explanation for its action." *Henderson v. Bush Bros. & Co.*, 868 S.W.2d 236, 238 (Tenn. 1993); *Daniels v. Wray,* No. M2008-01781-COA-R3-CV, 2009 WL 1438247, at *2 (Tenn. Ct. App. May 21, 2009). Factors the trial court should consider when deciding whether to allow amendments, especially late filed ones, include, "[u]ndue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Pratcher v. Methodist Healthcare Memphis Hospitals*, 407 S.W.3d 727, 741 (Tenn. 2013) (citing *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979)); *see also Welch v. Thuan*, 882 S.W.2d 792, 793 (Tenn. Ct. App. 1994) ("The futility of an amendment is clear when granting it would prolong the litigation, but almost certainly not lead to a different ultimate result.").

However, although permission to amend should be liberally granted, once a decision to deny the motion has been made, the decision "will not be reversed unless abuse of discretion has been shown." *Daniels*, 2009 WL 1438247, at *2; *see also Bellanti v. City of Memphis*, No. W2012-01623-COA-R3-CV, 2013 WL 360029, at *3 (Tenn. Ct. App. Jan. 30, 2013). As mentioned a trial court does not abuse its discretion unless it "applie[s] an incorrect legal

standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *Eldridge*, 42 S.W.3d at 85.

In this case, we recognize that the reasoning presented in the trial court's oral ruling was based on futility and differed from the reasoning set forth in the final order adjudicating this motion. *See Cunningham v. Cunningham,* No. W2006-02685-COA-R3-CV, 2008 WL 2521425, at *5 (Tenn. Ct. App. June 25, 2008) ("We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks.") (quoting *Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985)). However, despite this, we note that the written order adjudicating the motion to amend did provide *a* reason for the trial court's denial, primarily timeliness, stating that "the proposed amendment was not timely filed and is in effect an effort to interject a new claim against Dr. Evans some two years into the lawsuit and just weeks before the scheduled trial date, and therefore the motion should be denied[.]" Once the trial court provides a reason for the denial of the motion to amend, we are left only to determine whether the trial court abused its discretion.

We have emphasized in the past that a plaintiff who seeks to show an abuse of discretion carries a "heavy burden":

> A party seeking to have a lower court's holding overturned on the basis of abuse of discretion undertakes a heavy burden. The abuse of discretion standard is intended to constrain appellate review and implies "less intense appellate review and, therefore, less likelihood of reversal." . . . The fact that a decision is discretionary with a trial court necessarily implies that the trial court has a choice of alternatives among a range of acceptable ones; the reviewing court's job is to determine whether the trial court's decision is within the range of acceptable alternatives, given the applicable legal principles and the evidence in the case.

*State of Tenn. ex rel. Jones v. Looper*, 86 S.W.3d 189, 193–94 (Tenn. Ct. App. 2000) (citations omitted). With this heavy burden in mind, we note that this motion to amend was one of many Buman filed seeking to amend the original complaint and was brought 19 months after the lawsuit initially commenced and 17 months after Buman requested to add Dr. Evans as a party. This motion also presented a new cause of action after all the depositions of key witnesses had been taken, after a trial date had been set, and when Dr. Evans' summary judgment motion was pending. Though we note that the same order scheduling the trial gave a deadline for motions to amend that had not yet passed, neither party cites this deadline or argues that the inclusion of this deadline would prevent the trial

court from making the decision that it did.[10] This being the case, we affirm the decision of the trial court in denying Buman's request to amend the complaint to allege vicarious liability against Dr. Evans.

Having determined that summary judgment was appropriate in this case and that the trial court did not abuse is discretion in denying Buman's request to amend her complaint, we affirm the trial court's dismissal of all claims against Dr. Evans.

All other issues raised on appeal are pretermitted by this decision.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are assessed against Plaintiff/Appellant Marchelle Buman, Executor of the Estate of Kenneth Jenkins and her surety, for which execution may issue if necessary.

_____
PAUL G. SUMMERS, SENIOR JUDGE

---

[10] We are aware that generally speaking scheduling orders are only to be modified with "leave of the judge upon a showing of good cause." Tenn. R. Civ. P. 16.01(3). However, neither party presented an argument, or even a reference, to the deadline contained in this scheduling order on appeal. Because neither party has asserted this deadline as a basis for finding the trial court abused its discretion, nor can we find where this argument was made before the trial court, we decline to craft an argument for the parties. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400-01 (Tenn. Ct. App. 2006) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991)) ("It is not the function of the appellate court to research and construct the parties' arguments . . . . The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue."); *see also* Tenn. R. App. P. 13(b).